STATE of Tennessee, Petitioner,

v.

Tommy GADDIS and Charles B. Davis, Respondents.

Supreme Court of Tennessee.

Nov. 10, 1975.

R. A. Ashley, Jr., Atty. Gen., David L. Raybin, Asst. Atty. Gen., Thomas Evans, Asst. Dist. Atty. Gen., for petitioner.

Robert H. Crawford, Chattanooga, for Gaddis.

Jerry Summers, Chattanooga, for Davis.

## OPINION

HENRY, Justice.

We granted certiorari in this case in order to deal with the recurring question of the entitlement of a defendant, in a drug case, to a sample of the contraband drug in order to procure an independent chemical examination and analysis.

## I.

Defendants were jointly indicted on 9 *January* 1974 upon a charge of feloniously possessing a controlled substance with intent to sell or deliver. On 29 *January* 1974, the defendant Davis, pursuant to § 40–2044 T.C.A., moved the Court to "permit the defendant's counsel to inspect and copy, photographs or, in the alternative, be furnished a copy of any books, papers, documents or tangible objects obtained from or belonging to defendant or obtained from others which are in possession of or under the control of the District Attorney's Office". On the same date, Davis' counsel also moved for a list of witnesses. On the same date he moved for a copy of all exculpatory material and information and for a copy of all confessions. All these motions were sustained.

The defendant Davis, on 6 *February* 1974, moved the Court for "an order requiring the prosecution to supply the defendant with a sample of the drug specimen which is the basis for the prosecution in this case *in order that the defendant may conduct an independent scientific analysis of said substance*". (Emphasis supplied).

This motion was made *twenty-eight* days after indictment and *eighty-three* days before trial. It was overruled on 18 *February* 1974.

On 23 April 1974, eight days before trial, the defendant Gaddis moved to quash the indictment and for copies of confessions, admissions against interest, a list of the names of those present when any oral confession or admission was made, and to dismiss because he was a "mere passenger" in the vehicle in which the contraband drugs were found. All motions were overruled on the opening day of the trial except as to the confessions.

Neither the technical record nor the bill of exceptions reflect that the defendant, Gaddis, ever made a motion for a sample. The technical record affirmatively shows that the failure to furnish a sample was not assigned by Gaddis as an error on motion for a new trial. This matter, if ever raised by Gaddis, was abandoned in the trial court.

Upon the trial, on 1 May 1974, the jury found Gaddis guilty of possessing marijuana and fixed his punishment at not less than one nor more than six months in the county workhouse. Davis was convicted of possessing controlled substances with intent to sell and sentenced to serve not more than five years in the state penitentiary.

Each perfected his appeal to the Court of Criminal Appeals. That court, in a split opinion, held that the trial court should have granted the motion of the defendants for a sample or specimen of the seized evidence. The judgment of the trial court was conditionally vacated and the case remanded for further consideration under the guidelines of *McKeldin v. State,* Tenn., 516 S.W.2d 82 (1974).

The defendant, Davis, and the State of Tennessee petitioned this Court for certiorari. We granted the State's petition. It assigns a single error, viz.:

The Court of Criminal Appeals erred by determining that the defendants were prejudiced by a denial of the motions for the inspection of the drugs.

This assignment is imprecise. The trial court granted the motion for an inspection. The denied motion was for a sample or specimen for use in conducting an independent scientific analysis. This is the issue the State briefs and this is the question prompting our grant of certiorari. The primary reason for our grant was to settle the law and determine proper procedures and guidelines for disposition of motions for samples or specimen in drug cases.

## II.

The pertinent Tennessee statute, § 40–2044, T.C.A. reads as follows:

40–2044. *Copying certain books, papers and documents held by attorney for state* —Upon motion of a defendant, or his attorney, at any time after the finding of an indictment or presentment, the court shall order the attorney for the state, or any law enforcement officer, to permit the attorney for the defendant to *inspect* and copy or photograph designated books, papers, documents or *tangible objects,* obtained from or belonging to the defendant or obtained from others which are in possession of, or under the control of the attorney for the state or any law enforcement officer. The order may specify a reasonable time, place and manner of making the *inspection,* and of taking the copies or photographs and may prescribe such terms and conditions as are just. However, such *inspection,* copying or photographing shall not apply to any work product of any law enforcement officer or attorney for the state or his agent or to any oral or written statement given to any such officer or attorney for the state or his agent by any witness other than the defendant. (Emphasis supplied)

The key words are *inspect* and *inspection.* Webster's International Dictionary, Second Edition (1948) contains the following definitions, *inter alia* :

inspect—

To view closely and critically, esp. so as to ascertain quality or state;

To grade, as lumber;

To look closely; to examine.

inspection—

A strict or prying examination.

Law. The critical examination of something as a part of a legal proceeding;

The examination of articles of commerce (under laws called inspection laws) to determine their fitness for transportation or sale.

Examination is listed as a synonym under inspection and inspection is shown as a synonym under examination.

In 42 Am.Jur.2d, Inspection Laws, § 1, the following definition will be found:

Inspection, under an inspection law, has been defined generally as an *examination* to determine whether the article inspected is fit for use or commerce, and, more specifically, as something which can be accomplished by looking at or by weighing or measuring the thing to be inspected or applying to it some *crucial test,* without resort to other evidence. (Emphasis supplied).

Section 40–2044 T.C.A. was an obvious genuflection by the legislature to the endless-seeming demands of constitutional due process. It recognizes that the promptings of fairness demand that a criminal defendant not be deprived of evidence vital to the presentation of a full and effective defense. It must be construed so as to accomplish the evident legislative intent.

There are circumstances under which a mere visual inspection of a tangible object would meet the demands of due process and the requirements of the statute. For example, a mere visual inspection will enable a defendant to recognize his own pocket knife

or gun and no critical test or analysis is necessary. There are other circumstances under which a mere visual inspection would be of no conceivable value and where expert assistance is required and scientific test and analysis is essential. Drugs obviously belong in the latter category. It would make a mockery of any acceptable standard of fairness to hold that a defendant, in a drug case, may look at the drugs, but may not cause them to be subjected to scientific test. We will not impute such an absurd intent to the legislature.

It is no answer to say that the State's toxicologist, or other official, will make a competent and accurate analysis and make the result available to the defendant. This imputes to these examiners an aura of official infallibility inconsistent with the processes of the adversary system of the administration of criminal justice. We reject this approach.

This statute came before the Court of Criminal Appeals in *Kerwin v. State,* Tenn. Cr.App., 512 S.W.2d 632 (1972) (cert. denied).[1]

In *Kerwin* the Court held that trial judge did not err in refusing to grant the defendant's motion to inspect and make an analysis of the controlled substances, and stated in pertinent part:

> Morover, (sic) from the date of their indictment, the *defendants were the two persons in this world who were uniquely aware of whether or not they were involved in the sale of drugs* of some nature, and whether or not the controlled substances in the possession of the State could or could not be an item of incrimination against them, and *having this knoledge (sic) they were not entitled to its inspection,* if such inspection would hamper the State in proceeding with its case. They are the *only persons who knew whether or not they had in fact sold a controlled substance and therefore they were not denied anything needed in the*

*ascertainment of truth.* (Emphasis supplied) 512 S.W.2d at 635

■ The conclusion reached by the Court of Criminal Appeals is valid if, but only if, the defendant is guilty. We might rephrase this language to fit the case of innocent defendants and it might read substantially as follows:

> (T)he defendants were the two persons in this world who were uniquely aware that *they were not* involved in the sale of drugs . . . and having this knowledge they were *entitled* to its inspection . . . They are the only persons who knew that *they had not* sold a controlled substance, and therefore they were denied that which was needed in the ascertainment of truth.

Indeed the statute is designed to enable the innocent to establish their innocence. We cannot indulge in an unqualified presumption of guilt in advance of trial.

The dissenting opinion in the instant case contains this astonishing reasoning:

> The defendants in the present case knew the material confiscated from them was marijuana. *The State's toxicologist said it was.* The defendants did not need and could not have profited by an independent scientific analysis of the material.

This *might* have been a correct legal conclusion before the Barons of England met old King John on the banks of the Rynnymede in 1215 and wrested from him the Magna Charta; but the presumption of innocence is too firmly established as a part of the English common law and American jurisprudence for us to assent to this reasoning. This is a bald conference of absolute infallibility upon a state's witness. It "was marijuana" because the state's witness "said it was".

■ We overrule so much of *Kerwin* as holds that a criminal defendant is not entitled to inspect and make an analysis of the seized controlled substance.

---

1. The Supreme Court denied certiorari on August 12, 1974. There has been a substantial change in the composition of the Court since that time.

We hold that it was the legislative intent in the enactment of § 40–2044 T.C.A. to permit a criminal defendant to demand and receive a sample or specimen of a controlled substance in order to have an independent analysis made by an expert of his own selection, and at his own expense, but under such conditions as the trial judge may impose.

▆ A motion for such inspection and analysis may be made at any time after arrest but must be made in ample time so as not to result in a postponement or continuance of the final hearing. A motion not so made may be treated as being filed untimely, in the discretion of the trial judge.

▆ The District Attorney General will lodge with the court file, the original or a copy of all tests or analyses promptly upon their receipt. When a motion is made and sustained for a sample, defense counsel will follow the same procedure.

▆ We recognize that there are cases wherein the contraband commodity will be destroyed, exhausted or consumed by the test or its identity will be altered by chemical analysis. When such a situation arises, good faith demands that no test or analysis be made except by agreement between the District Attorney and defense counsel, or until such time as defense counsel may arrange to have his own expert present at the test.

▆ From this day forward these guidelines will apply. The orderly administration of criminal justice precludes their being applied retroactively. We adopt them as implementing instructions pursuant to the statute and under the inherent power of this Court.

### III.

We note an emerging trend toward broad and reciprocal discovery in criminal cases. The days of trial by ambush are numbered. Rapidly fading is what Dean Pound describ-ed as the "sporting theory of justice". In *Williams v. Florida*, 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970), the Supreme Court said:

> The adversary system of trial is hardly an end in itself; it is not yet a poker game in which players enjoy an absolute right always to conceal their cards until played. We find ample room in that system, at least as far as 'due process' is concerned, for the instant Florida rule, which is designed to enhance the search for truth in the criminal trial by insuring both the defendant and the State ample opportunity to investigate certain facts crucial to the determination of guilt or innocence. 399 U.S. at 82, 90 S.Ct. at 1896.

We note the liberal provisions of Rule 16 of the Federal Rules of Criminal Procedure, and the amendments thereto which became effective August 1, 1975.

Full discovery is consonant with requirements of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) holding that due process requires that the prosecution disclose evidence favorable to the accused.

We note a growing trend among other American jurisdictions requiring that in narcotics cases the defendant be permitted to inspect, test and analyze the contraband commodities. See 7 ALR 3d 8, Discovery— Prosecution's Evidence and cases cited therein.

We have also noted American Bar Association Standards relating to Discovery and Procedure before trial. We note the General Preamble as contained in 1.1 as follows:

1.1 Procedural needs prior to trial.

(a) Procedures prior to trial should serve the following needs:

(i) to promote an expeditious as well as fair determination of the charges, whether by plea or trial;

(ii) to provide the accused sufficient information to make an informed plea;

(iii) to permit thorough preparation for trial and minimize surprise at trial;

(iv) to avoid unnecessary and repetitious trials by exposing any latent procedural or constitutional issues and affording remedies therefor prior to trial;

(v) to reduce interruptions and complications of trials by identifying issues collateral to guilt or innocence, and determining them prior to trial; and

(vi) to effect economies in time, money, and judicial and professional talents by minimizing paperwork, repetitious assertions of issues, and the number of separate hearings.

(b) These needs can be served by (i) fuller discovery, (ii) simpler and more efficient procedures, and (iii) procedural pressures for expediting the processing of cases.

We also note Standard 1.2 relating to the Scope of Discovery, as follows:

1.2 Scope of discovery.

In order to provide adequate information for informed pleas, expedite trials, minimize surprise, afford opportunity for effective cross-examination, and meet the requirements of due process, discovery prior to trial should be as full and free as possible consistent with protection of persons, effective law enforcement, the adversary system, and national security.

Among the prosecutor's performance of obligations listed in Standard 2.2 is the following:

(b)

(i) notifying defense counsel that material and information, described in general terms, may be inspected, obtained, tested, copied or photographed, during specified, reasonable times; and

(ii) making available to defense counsel at the time specifies such material and information, and suitable facilities or other arrangements for inspection, testing, copying and photographing of such material and information.

While we look upon these standards with general favor, we do not adopt them, at this time, because some of the situations they address are not before the Court in this controversy and for the further, and more important reason, that the commission charged with the responsibility of drafting the Criminal Rules of Procedure is actively engaged in the formulation of these rules and its final report is expected by the end of this year. We defer the formulation of further rules pending the incoming of the Commission's report.

In the meantime, we have made it clear that this Court looks with favor on full and reciprocal discovery in criminal cases, to the maximum extent possible consistent with the constitutional rights of those accused of criminal acts.

## IV.

■ In the case of Tommy Gaddis, the Court of Criminal Appeals is reversed and the judgment of the trial court reinstated. If he, in fact, moved for a sample, it was not until the day of the trial. Such motion was untimely.

■ In the case of Charles B. Davis, we affirm the action of the Court of Criminal Appeals in vacating his judgment of conviction. We remand to the Criminal Court at Chattanooga with directions to that court to cause a sample of the contraband drugs to be made available for test and analysis by an expert of his own selection, and at his own expense, and under such restrictions as the trial judge may impose. In the event the analysis demonstrates that the seized materials are controlled substances, the judgment will be reinstated and immediately carried into execution. If the analysis demonstrates that they are not controlled substances, a new trial will be awarded. If the drugs are no longer available the *McKeldin* procedure will be followed.

The costs of this appeal are taxed against the State of Tennessee.

FONES, C. J., COOPER and HARBISON, JJ., and INMAN, Special Justice, concur.